Good morning, Your Honors. My name is Charlie Tebbitt, and I represent St. John's Organic Farm and Peter Dill in this action. The issue before this Court today is whether Peter Dill is entitled to fees and costs based on a settlement in which he obtained better results than he would have been able to obtain through the courts. So the issue is, should the effectiveness of the settlement agreement be held against us? The settlement included provisions that prevented the Gem County Mosquito Abatement District from applying chemical pesticides, known in the briefs as adulticides, to the Payette River and its numerous tributaries and canals within the Mosquito Abatement District boundaries, all waters of the United States. The District Court held that the relief obtained by Dill was not specifically requested in the complaint, and thus Dill did not obtain the relief requested. That's the heart of the District Court's order. This decision completely ignores that the heart of the Clean Water Act is the elimination of pollution, a result obtained by Dill in this case. Well, what he really wanted was an NPDES permit, right? The relief he sought was essentially injunctive. Not that the District can't spray, but that in order to do so they have to comply with the terms of a pollution control permit. That's the mechanism of, that is what is available under the Clean Water Act. You couldn't ask for relief that says stop spraying under the Clean Water Act. In fact, they have not stopped spraying. They have certainly changed their spraying practices, but the county continues to spray for mosquitoes, do they not? They do, but not into waters of the United States, and that's the crucial issue in this case. They have stopped discharging into waters of the United States. The aerial spraying ceased. Counsel, am I incorrect? I did a little bit of environmental work before I came on the bench, and I recall representing pulp and paper mills that discharged into navigable waters, but they did so pursuant to limitations that were prescribed in an NPDES permit. It doesn't prevent them entirely from discharging, does it? It does because it does two things, Your Honor. One, and this is different from a pulp and paper mill that ongoingly discharges. These are controlled events, and we identified those controlled events as the aerial spraying, number one, and number two, the truck fogging. And what this achieved is a cessation of aerial spraying that then the planes or a point source discharge into the waters of the United States. Stop that. But wouldn't those chemicals ultimately reach the river through the water table? I'm not sure I understand your question, Your Honor. You're trying to suggest that what Mr. Dill was seeking was a complete cessation of discharge into the navigable waters, and the only way I know to achieve that is to prevent the county from spraying entirely. Otherwise, it's going to get into the navigable waters one way or the other. Right. If it does, that's from a non-point source, and that's not actionable under the Clean Water Act. The only action we could have brought is for the point source discharge of a pollutant into the waters of the United States, and that's what was stopped. It's the point source discharge that was stopped. And what, in effect, you were after in seeking the compliance with what you claimed to be the requirement of the CWA, that is to say the permit, was that either the permit would have been denied so the spraying that would have gone directly to the river would not be permitted, or in the permitting process, there would have been some modification or reduction. Correct. The effect of what you wanted was to limit or to eliminate spraying directly into or onto the river. Correct. And that's what you got in the settlement. We did, indeed. And actually, Your Honors, I forgot to ask you that. I'd like to reserve three minutes for rebuttal. Okay. Could you turn to the issue of abuse of discretion and the discretion of the district court under the statute in terms of when it can or may award attorneys fees? Yes. And the first issue is the legal issue. It's a question of whether the party is a prevailing party as a matter of law. And here we did achieve substantial benefits of the litigation. It's not the exact relief that the court hung its hat on, and that's where the court went wrong as a matter of law and hung its hat on the fact that because we didn't achieve the exact results in the complaint, that we're not a beneficiary of the act. But that's not the case. The second problem, as I understand it, is the district court may award attorneys fees if it finds it appropriate. Correct. Why doesn't that provide a substantial amount of discretion in the district court to which we must defer? I mean, that is the discretion standard. Yes. And we did address that, and I'm sure counsel will try to get at the so-called waiver issue. But we did address that in our opening briefs in pages 25 through 27 and in our standard review where we – You may assume for purposes of my question that I don't think you're necessarily waiving the issue. Okay. But the question is how much discretion does the district court have? Right. And because he clearly articulated some reasons why he didn't think award of fees was appropriate in this case. Yes. Yes, and the answer to that is this court is essentially sitting in the same position as the district court based on the procedural nature of this case. There was nothing substantive on the merits that went before this court. It's not de novo review, is it? We don't look at the whole thing all over again and exercise our own discretion. The question is did the district court abuse its discretion? Right. And the question here is are those facts based on the record? And so here we challenge the facts that the court relied upon in its decision as incorrect. Incorrect as a matter of the settlement agreement and incorrect as a matter of law. What's the standard? I'm not asking standard review, but I'm asking what's the standard under this? Assuming that there's a finding of prevailing party, that is to say assuming you win up to that point. Yes. What's the standard that the district judge applies in deciding whether fees are appropriate once having found that you're a prevailing party? Well, it really becomes a question, once you become the prevailing party, the whenever appropriate creates an exception, if you will, for the district court to find a very strange set of circumstances where the plaintiffs aren't entitled to fees. And my sense of the district court rationale as to why, even if you were prevailing party, the district court thought it not appropriate was that the Jim County Mosquito Abatement District had bent over backwards to sort of accommodate your request and so on. At what point in the sequence of events here does the abatement district start cooperating with you? After you threatened litigation or before? After. After the notice letter went out. So they're not just sort of saying, please, can we help you? They're saying, we'd like to help you out now that we know you're coming after us. Right, and in fact, they actually sued my client in the D.C. District Court inappropriately, and we won on that regard. So there was a history of actually bad blood, if you will, by the Mosquito Abatement District. They had actually taken after my client very personally in prior years, and my client took a very measured approach to it. And only when the Mosquito Abatement District contracted to aerially spray again in 2003 did my client send out the notice letter. Okay, well, you've got a couple of minutes. Do you want to save those? I will if you have no further questions at the moment. Thank you, Your Honor. We might when you come back up, but let's hear from the other side, and then you'll have something to respond to. Thank you. Good morning. May it please the Court, my name is Paul Turk. I represent the Mosquito Abatement District. With me is Co-Counsel Murray Feldman. Mr. Feldman represents Jim County. I'm going to try to use only three minutes. Are you going to be the sole person arguing? No, I'm not. I'm going to use just three minutes as my intention, and Mr. Feldman is going to cover whatever time I'm able to reserve for him. I think it's apparent from argument that appellant fundamentally misrepresents the procedural context of this case. There are very few instances in which this court doesn't sit in deference to the findings of a district court, particularly here where it's an abusive discretion standard. Appellant all but admits this morning that they essentially just want to re-argue the case to this court because it, quote, Could you address first, please, whether appellant is a prevailing party? Unless that's something that your colleague is going to address. If I may politely defer, Mr. Feldman is the one that's going to address that, and that's why we gave him more time. Are you just addressing whether relief is appropriate? I am, Your Honor, and that is, I think, where we want to focus, and as Judge Tallman pointed out, it's not necessarily a sequential analysis here. These are independent and disjoined elements of a two-pronged test, and the whenever appropriate prong, I think under an obvious reading of the statute, could essentially trump the prevailing party analysis. Well, clearly you can't get a fees at all if you're not a prevailing party. Certainly. But as I read the law, that only gets you halfway there. If you don't get fees automatically, then the question is, does the district court determine that fees are appropriate to this prevailing party? You read the statute? Absolutely. So what's the legal standard for when a district court can deny fees to someone who's been determined to be a prevailing party? I think it then gets back to the abuse of discretion standard, which is- No, that's the abuse of discretion standard by which we review. The question is, what's the standard the district judge is to apply? Well, the reason why I say I think it relates to the abuse of discretion is because I think the district court has to make some kind of rational statement as to why it didn't deem fees appropriate. And I want to focus on the district court's analysis here, which generally I think certainly acknowledges the legal standard. It's thoughtful, well-reasoned, if not persuasive. And I'm looking at page 20 of the order where the court identifies the broader context here and says that the county was between the proverbial rock and the hard place in having to defend EPA's policy of not requiring a discharge permit. What are we to make of the Cotton case that now says, in fact, they were wrong? Well, first of all, appellant admitted that Cotton wasn't relevant, but to the extent it has any relevance, I think it only identifies the wisdom of the county in trying to negotiate a way out of the being between the rock and the hard place. I mean, Cotton was fascinating to me in that it was referred by the multidistrict panel, included this kind of who's who of lawyers from some of the biggest firms in the country duking it out in the circuit court from cases that arose from five or six different circuits, in which plaintiffs eventually prevailed. So we now know that, in fact, a permit is required. Correct. And that we would argue they settled for less here and that our clients exercised some wise discretion in avoiding this fight. Well, avoiding this fight, they started to cooperate only after Mr. Gill came after them. It wasn't as though they went to him and said, hey, what can we do to help out? I'm already past my time, and as I indicated, Mr. Feldman is the one that – Before you sit down, let me just make sure I understand your argument. In looking at page 20 of the court's order, is your point that he found it was appropriate or not appropriate to award fees here because at the time Jim County acted, they had no reason to believe that their actions were unlawful or improper because that was EPA policy and that didn't change until later when the Sixth Circuit ruled? Is that what you were arguing to? That's part of the argument, and I also think it's based on the district court's view, which of course we shouldn't second-guess on appellate review, that the parties conducted themselves reasonably, that they entered a settlement that was detailed and well thought out. And the suit that was settled, was it a suit that was seeking an injunction that would require your client to get a permit? That's my understanding. So it was raising directly the question that was ultimately answered in the Cotton case out of the Sixth Circuit. So they knew that was on the table, and rather than litigate that one to termination, which I guess would have ended up in the Cotton case and losing, they settled. We don't know what would have happened had we litigated the Cotton case in the District of Idaho.  But we did avoid the Cotton result through this settlement. Well, you accommodated what became the Cotton result. Now that we've taken all kinds of time away from you to go, counsel. I'm sure I will be popular for that. We'll make sure he gets to make as much argument as he needs to make. Thank you, Your Honors. May it please the Court, I am Murray Feldman, here on behalf of Jem County and the Jem County Board of Commissioners. Judge Fletcher, first a few of your questions. After the notice of intent to sue, that is the proper purpose of the notice there, is to try to negotiate between the parties. So the fact that the county didn't start, the county would believe that they provided provisions for Mr. Dill and had ways for him to avoid spraying him before the notice of intent to sue. But the fact that the party started working then, that's what the statute seeks to encourage. That's why there's the notice and delay provision. So they were acting consistently with the Clean Water Act there. Mr. Feldman, what should the rule of law be as to when, if someone's a prevailing party, it's not appropriate to give them fees? Yes. Turning now to your question, Judge Gould, the rule of law, we believe, in this circuit, is the formulation that the Supreme Court has announced in Buchanan, but also in Texas state teachers. And this is the formulation that Judge Windmill applied. And this has been applied in this circuit then, for instance, in RCRA cases that have a similar fee-shifting provision where it has a prevailing party requirement. And that is, and as here in the settlement context, to be a prevailing party, the party must obtain some actual relief on the merits of the party's claim that provides a change in the legal relationship of the parties in a way that the fee statute seeks to promote. And the key parts that the county's relying on here is actual relief on the merits and in a manner that the fee statute seeks to promote. And if we look at the fee statute here, which is the Clean Water Act, and the fee-shifting provision is in the citizen suit provision there, too, in Section 505, and what that authorizes is a suit if a party's in violation of any effluent limitation or standard, which essentially means, as in this instance, the alleged permit requirement. That's actionable. What's not actionable is the general goals and objectives that Mr. Dill is relying on now. How do you deal with our Fisher case, the ADA case? Because that seems to me not very helpful to you. What they went after was an injunction. What they got was a kind of settlement that required education and various things, and our court was quite happy to treat that as being prevailing party, even though they didn't get the injunction they sought. I think we would go after that the same way that the district court addressed it, which is Fisher focused on only certain elements of the test, and perhaps other elements weren't at issue, but was not focused on the relief on the merits and change in the way that the fee statute seeks to promote. So one way to distinguish it was that it's a different fee statute, and here, although we have the general Buchanan framework, we still need to focus on the Clean Water Act and what it seeks to promote. And Judge Gould, it's not cited in the briefs, but Judge Windmill did cite Judge Gould's decision in the Hammersley Inlet case, which very well sets out the distinction in the Clean Water Act between the goals of the act and the methods by which those goals are to be achieved. And there the court said, a cornerstone of the Clean Water Act is that the discharge of a pollutant from a point source is unlawful unless the discharge is made according to the terms of an NPTS permit, similar to Judge Tolman's questions earlier. And that was the focus of Mr. Dill's claim. It's not an actionable claim under the act to try to enforce the general national goals of eventually eliminating discharges or eliminating discharges of toxic pollutants and toxic amounts. But it seems to me commonsensical that if he's after an injunction that would require you to get a permit, or after a ruling that would tell the EPA a permit is required, of course what anybody's after when they're seeking a permit requirement and compliance with a permit requirement is they're counting on the EPA in the permitting process to do something to limit or sometimes even eliminate the would-be pollution. I mean, that's the practical effect of the permitting process. That's the design of the process. There could be, right, there could be an effluent standard or discharge limitations. There would be monitoring requirements. And that, again, Your Honor, is... That's ultimately what he was after, and that's what he got in the settlement, which is why I come back to the Fisher case. Well, Your Honor, factually the county's position would be that is not what Mr. Dill obtained because there still are many discharges that can be made under the settlement. There's no permit requirement, and there still are discharges. But he's not allowed to discharge next to the river. I forget, what is it, the 300 yards setback? Only in certain areas and only for truck fogging for adulticides, but larvaciding can occur right up to the land-water interface, and in identified areas like the Gem Island Sports Complex and along River Street, truck fogging could occur right up to the land-water interface. And it is your contention, then, in fact, that you would not be allowed to get a permit under that to do that? It's just that the... That is to say, if your contention is you would not be allowed to get a permit to do that, you may be giving away more than you want to give away. On the other hand, if that's your contention, your argument doesn't work very well right here. Well, I understand your point, Your Honor. I'm not saying that we couldn't get a permit under the new framework that Your Honors have been discussing, but as it existed and as Mr. Dill requested, no permit was required for that. The point is that cornerstone method that Congress sought to propose in the Act still wasn't required as a result of what Mr. Dill achieved. I realize that the argument was divided. Nonetheless, I'd be interested in your view on the assumption for purposes of this question that Mr. Dill was a prevailing party. So we get to the second test, which is to say appropriateness of fees. I think this was the question Judge Gould asked you. What is your view as to the standard the district judge should apply? And I apologize if I misunderstood Judge Gould's question. I may have jumped ahead to his earlier question. I'm not sure. In any event, that's my question. But Your Honors are right. You're asking a very good question. I would offer two guideposts to the actual standard that the district court would have been applying, not the standard of review here, and that is, one, the statement in the Senate Committee Report on the Water Quality Act, and that's cited on page 20 of our brief, that report. And the Senate Committee Report said it was adding this prevailing party language in the 1987 amendments because it wanted to limit the award of costs under the Clean Water Act to prevailing or substantially prevailing parties. And then it mentions where the party had prevailed on the issues. And then it says, quote, if such award is deemed appropriate by the court. Now, I recognize, again, that's not much guidance. But, again, Congress seems to be suggesting wide discretion there for the district court if deemed appropriate. Yeah. You know, there's an awful lot of case law out there that neither of you seems to have cited. And as I read the case law, there's a fairly strong presumption in favor of an award of fees once prevailing party status has been found. The district judge is not at liberty just to say, well, yes, plaintiff is a prevailing party, but, you know, on balance, I just don't think they ought to get it. It's a pretty narrow exception. Some circuits have said, you know, basically once you're a prevailing party, that's the end of the matter. You get fees. I understand, for instance, in the Supreme Court Hensley case, it speaks to special circumstances that might otherwise make a fee award unjust. But one other piece of guidance would be in the NRDC versus Thomas case from the D.C. Circuit where the court was considering there may be some instances there under when the language of the Clean Water Act had only the whenever appropriate standard and not the prevailing party, still saying there's going to be instances where a fee award wouldn't be appropriate, and it might be, for instance, awarding fees against private parties since they have a different ability to bear the costs and different responsibilities for fulfilling the goals of the statute that they were actually citing to an example. It's a Clean Water Act case there, but they were citing to Supreme Court language in a Clean Air Act case. And we submit, Your Honors, that's the situation here. That's what Judge Windmill recognized, that this was a special situation. The county is not the permitting agency. They're not in charge of implementing the program. When they got the notice letter from Mr. Dill, they applied for and sought to obtain a permit from EPA, but they were not able to, hence the district court's formulation that they were between a rock and a hard place. And this may be, then, one of those unique circumstances where a fee award is not appropriate because of those special circumstances, Your Honor. Is this a special improvement district that taxes the landowners? Yes, Your Honor. It is essentially a local district. It has taxing authority through the county commissioners under the Idaho statutes that create the Mosquito Maintenance District. But it's not a state agency or a county agency in that respect? It is created by the county commissioners. It is a separate board of commissioners, but their annual budget and operating plan is approved by the county commissioners. And the other question about appropriateness is what role, if any, did the district court give to the fact that we have a mosquito abatement program in order to stop the spread of West Nile virus? And essentially, we've got a public health issue. And so we have competing interests at stake here, keeping the waters as clean as we can make them but also stopping the spread of a very dangerous disease. I think that was one of the issues the district court considered, Your Honor. The presence and threat of West Nile virus is cited in the district court's decision, and it was certainly presented in the briefing. And as Mr. Beale's counsel has noted, there were procedural issues, but the one hearing I believe that was held before the district court, it was addressed there as well. And that's essentially why they're doing the spraying, is it not? Not only for West Nile virus, but, yes, that is one of the chief public health concerns, yes, and it's in the abatement plan. And every other disease that's borne by mosquitoes. Yes. Okay, thank you. As a practical matter, what are we talking about? Roughly speaking, what would the fee award be? I believe the amount that – I don't want you to commit. I understand once you get to that, you start fighting about the amount. But you wanted the approximate amount, Your Honor? Just roughly speaking. $150,000 before these proceedings at appeal, I believe, Your Honor, was the request. Okay. And I think we've now given you enough time that Mr. Turk is kind of off the hook. I appreciate it very much, Your Honor. And, Judge Fletcher, it's nice to see you both on the court and in the classroom, as I did several years ago. Okay, thank you. Thank you, Your Honors. I'd like to address just a couple of issues, and one that, Judge Fletcher, you started out with, the presumption of fees. We did cite to a number of cases, not every single case, obviously, and I thank you for your research on that. I've got a law clerk. The Piggy Park case and virtually all others, as you noted, do say that once you're prevailing party, you're essentially entitled to fees. It's an entitlement issue. I'm not quite sure I share Judge Fletcher's view. The statute says may, and it talks about prevailing party and appropriate, and if that's the case, then I don't see that as an automatic entitlement. That language in the statute has to have some meaning. Right. Can you address the question that I asked Mr. Feldman with regard to the district court trying to balance? Sure. The competing interests here? Yeah, I'd be happy to. But we do have a very serious public health problem. Yes. But first of all, Judge Feldman, the Supreme Court has addressed the issue about the appropriateness of fees on numerous occasions in numerous district courts. That make this automatic. It's not automatic. Right. And I won't say it's automatic, but it's close to automatic. Once you hit the prevailing party. Absolutely. In the context of the facts of this case. You asked the question about is the spraying for West Nile virus. In this case, it wasn't started that way. It was started decades ago in Jim County before West Nile virus was even heard of. Malaria. Well, it was a prophylactic thing. It was an aesthetic thing, actually, in Jim County because there were a lot of mosquitoes. It wasn't a health threat. There was no malaria. There were no other health. There is West Nile virus now. Now. Yes. But West Nile virus was just coming into being during this period of time when this lawsuit started. So West Nile virus is a secondary factor. But we also took in. You're not arguing that that wasn't one of the purposes of the spraying. It was a later added purpose for Jim County. It wasn't there. Yes. It was a purpose. But what we. I don't think you're helping me. Well, let me try to help you, Your Honor. My client took a very holistic approach to the issue and said, let's eliminate the mosquito breeding issues. Let's not just throw the program asunder. But let's make the program work better. And, in fact, if you look at the results on the ground, you'll see that Jim County now has a more efficacious program with using fewer pesticides. And that's the real issue. You're trying to reduce the risk while reducing the pesticides. And you can do both. They're not mutually exclusive. And that's what we achieved in this case. And what we achieved in this case was no discharge to Waters of the United States. And we have to go back to that fundamental question. And to answer, I think, the question that's floating around here, what's the legal standard? Judge Gould, Judge Fletcher, you raised it as well. What legal standard do we look at? And I would argue that the legal standard is the Buchanan standard, as much as I might not like Buchanan itself. Buchanan is probably the standard for who's a prevailing party, right? Yes. And let me take the issue one step further, because the issue is did we achieve a material alteration of the legal relationship of the parties? Yes, we did. And is it significant? And I think that's where we get to the whenever appropriate issue. If it wasn't a significant or a material alteration, then it wouldn't be appropriate. But here in this case, DIL achieved the results that go to the heart of the Clean Water Act, the cessation of the discharge of pollutants into our nation's waters. From a point source. From a point source, correct. And that's all we could have achieved in this case, and we did it. We went beyond what the court could have awarded and achieved it through settlement. Should we now be punished for that? I think not. The question is whether or not you get your attorney's fees for that. That's correct, and that's punishment for my client, Your Honor. Okay. Thank you. If I may. Well, you're over time, so why don't you wrap up. I won't make you sit down immediately, but if you can continue. It'll be brief, Your Honor. The biggest fallacy of the Mosquito Abatement District's argument can be summed up in their own words. And I'm quoting them. DIL did not merely achieve a lesser degree of success in a single claim. DIL settled on terms that were unrelated to the Clean Water Act. That's simply not the case. Mr. Feldman argued that again today, that it's purely an NPD. It's a permitting issue. The purpose of the Clean Water Act wasn't to issue permits. It was to use the permits to stop discharges. We've skipped over the permit, stopped the discharge. We believe we're the prevailing party and that, therefore, it is appropriate. And the court should remand this issue with a direction to the district court to award fees. Then the court can decide what the amount is. Thank you very much. Nice arguments from both sides. Thank you very much. The case of St. John's Organic Farm v. Jim County Mosquito Abatement District is now submitted for decision. And nice to see you again, Mr. Feldman, outside of class. One more case before we take a break, and that's Foam v. Estra.
judges: Fletcher, Gould, Tallman